JEWEL COMPANIES, INC., APPELLANT, *v.* PORTERFIELD, TAX COMMR., APPELLEE.

(No. 69-796—Decided September 24, 1970.)

*Messrs. Wright, Harlor, Morris, Arnold & Glander, Mr. C. Emory Glander,* and *Mr. Charles F. Glander,* for appellant.

*Mr. Paul W. Brown,* attorney general, and *Mr. C. Luther Heckman,* for appellee.

*Per Curiam.* It should be noted at the outset that in each tax year involved in the audit period, the appellant used a system of estimating its sales tax liability for the year, rather than using invoices to report actual sales. The estimate of sales was based upon the amount of cash collections made by appellant during the tax year. Appellant's

collections account does not distinguish between cash received from a cash sale and cash received on accounts receivable. The estimated gross sales reported by appellant during the years involved in the audit period totaled $22,690,657.

It should also be pointed out that in each of the tax years involved in the audit period, the Tax Commissioner did not take exception to appellant's method of reporting its sales or in any manner complain of the adequacy of appellant's system of maintaining its books and records. Thus, the dispute in this cause only tangentially raises questions of the adequacy of the appellant's record-keeping system and the propriety of appellant's method of estimating its sales. The basic disagreement between the parties concerns certain methods of computation used by the Tax Commissioner in auditing appellant's books and records for the years involved, which resulted in the assessment made against appellant pursuant to R. C. 5739.13.

The Tax Commissioner and appellant agree that, based on the test check used during the audit, the effective rate of taxation should be 3.0468 per cent. The parties also agree that certain sales in the amount of $6,398,942.16 represent sales of exempt items and therefore should not be included in the computation of net taxable sales. Appellant also admits that it failed to include in its gross sales $437,278, which represents sales written off as bad debts. Appellant concedes that there is a deficiency for the audit period in the amount of $34,416.68, which it is prepared to pay. Finally, there is no dispute that on December 31, 1963, the beginning of the audit period, appellant had an accounts receivable balance of $1,218,691, which represented sales of tangible personal property prior to the audit period, and that at the end of the audit period the accounts receivable balance was $1,398,176.

Appellant objects to the decision of the Tax Commissioner that the proper computation of its sales for the audit period requires that all the accounts receivable outstanding at the close of the audit period, in the amount

of $1,398,176, should be included. The appellant argues that the correct method of computation of its sales requires that only the difference between the accounts receivable balance at the beginning of the audit period and that balance at the end of the audit, in the amount of $179,485, should be included.

Appellant also objects to the Board of Tax Appeals decision that the Tax Commissioner properly computed appellant's sales for the audit period by including all so-called bonus credits issued by appellant to its Ohio customers during the audit period, in the amount of $1,205,206. Appellant concedes that $572,701 represents bonus credits issued on exempt sales and therefore those bonus credits are properly to be included in its net taxable sales. However, it objects to the balance of the bonus credits, *i. e.*, those issued on nonexempt sales, being included in its net taxable sales.

In short, it is the Tax Commissioner's position that appellant's net taxable sales should be computed as follows:

| | |
|---|---:|
| Sales reported during audit period | $22,690,656.21 |
| Accounts receivable removed (bad debts) | 437,278.00 |
| Accounts receivable | 1,398,176.00 |
| Bonus credits | 1,205,206.00 |
| Gross sales | $25,731,316.21 |
| (minus) Exempt sales | 6,398,942.16 |
| Adjusted gross sales | $19,332,374.05 |
| (minus) Adjustment for accounts receivable purchased (Board of Tax Appeal's modification.) | 4,827.00 |
| Net taxable sales | $19,327,547.05 |

On the other hand, appellant asserts that its net taxable sales should be computed as follows:

| | | |
|---|---:|---:|
| Collections | $22,980,383 | |
| Accounts receivable removed (bad debts) | 437,278 | |
| Accounts receivable | 179,485 | |
| Gross sales | | $23,597,146 |
| Adjustments to gross sales: | | |
| (minus) Exempt sales | $6,398,942 | |
| (minus) Accounts receivable purchased | 4,827 | |
| (minus) Interest | 329,887 | |
| (minus) Postage charges | 265,123 | |
| | | 6,998,779 |
| Adjusted gross sales | | $16,598,367 |
| Adjustment for retail value of bonus credits issued on exempt sales (food items) | $572,701 | |
| Net taxable sales | | $17,171,068 |

The Tax Commissioner justifies his decision to include all of appellant's accounts receivable in the computation of net taxable sales because, during each tax year involved, appellant's system of estimating its sales resulted in reporting only sales upon which a cash collection was made, *i. e.,* cash sales and cash received on accounts receivable. Thus, Tax Commissioner correctly asserts that the accounts receivable balance at the end of each year involved in the audit period would represent sales which

had not been reported when the sale was made, as required by R. C. 5739.02.

Appellant takes exception to this method of computation on the ground that the inclusion of the total value of accounts receivable outstanding at the end of the audit period, rather than including only the difference between the accounts receivable balances, results in an overstatement of appellant's sales for the audit period by $1,218,691. Thus, according to the appellant, the Tax Commissioner's computation includes $1,218,691 of sales made prior to the audit period and is violative of the four-year statute of limitations contained in R. C. 5739.16. Moreover, it is appellant's position that such a method of computation ignores the uncontradicted testimony of appellant's witnesses that the sales tax has been paid on the accounts receivable represented by the beginning accounts receivable balance, thus resulting in those sales being taxed twice, and that appellee's method of computation violates accepted accounting principles.

It is generally stated that, in the absence of a special statute to the contrary, the books and records of a taxpayer must be kept and maintained in accordance with sound and generally recognized accounting principles. *National Tube Co.* v. *Peck* (1953), 159 Ohio St. 98, 111 N. E. 2d 11, paragraphs four and five of the syllabus. Cf. *R. H. Macy Co.* v. *Schneider* (1964), 176 Ohio St. 94, 197 N. E. 2d 807.[1] However, the Tax Commissioner does not attack the adequacy or propriety of the instant taxpayer's record-keeping system. Rather, it is his position that the inclusion of

---

[1] A generally recognized formula used to determine sales for a specified period is:

S equals C + A/R2—A/R1

where

S equals Net sales

C equals Cash collections

A/R1 equals Accounts receivable at the beginning of the period.

A/R2 equals Accounts receivable at the end of the period.

Lipkin, Accountant's Handbook of Formulas and Tables, 122.

all of the accounts receivable is justified in this case because they represent sales that were not reported when made.

It is clear, and the parties agree, that the accounts receivable balance at the beginning of the audit period represents sales made prior to December 31, 1963. R. C. 5739.16, provides, in pertinent part:

"(A) No assessment shall be made or issued against a vendor or consumer for any tax imposed * * * more than four years after the return date for the period in which the sale or purchase was made, or more than four years after the return for such period as filed, whichever is later."

Thus, whether sales tax has been paid on sales represented by the accounts receivable balance at the beginning of the audit period would appear to be immaterial. The Tax Commissioner's method of computation of sales for the audit period includes sales made prior to the beginning of the audit period and this results in the imposition of a sales tax on sales made more than four years after the sales were made, in violation of the statute of limitations. R. C. 5739.16.

The appellant has consistently asserted that its collections account should be adjusted for interest charged on the accounts receivable and postage expenses paid by its customers. (See appellant's table, *supra*.) Apparently, appellant is able to substantiate those adjustments to the cash collection account in spite of the fact that it cannot determine what portion of the collection account represents cash sales and what portion represents payments on accounts receivable. The record is silent on this point, however, and a determination of the propriety of those adjustments is, therefore, left to the Board of Tax Appeals.

The next question to consider is the proper method of recognizing appellant's use of bonus credits as taxable sales. It is the Tax Commissioner's position that all of appellant's bonus credits should be included in the tax base upon which appellant's sales tax liability is to be deter-

mined, because all of the bonus credit transactions are properly characterized as unreported taxable sales made during the audit period. To justify this approach, the Tax Commissioner analogizes appellant's use of the bonus credits to the use of trading stamps.[2] Appellant argues, however, that there is no basis in fact for the use of such a comparison.

The record in this case reveals that when appellant sells an item which is subject to sales tax, the tax is also charged on the bonus credit given to the customer. This situation may best be illustrated through the use of an example discussed at the hearing before the Board of Tax Appeals:

"A. In the normal course of our business, we have two categories of merchandise. We have grocery items and general merchandise items. On the grocery items, we have two listings of values. When a grocery item is sold in conjunction with a general merchandise item, the higher value is charged to the customer.

"Q. What is the general merchandise item? Is that what you mean by a premium?

"A. Yes.

"* * *

---

[2]The Tax Commissioner, in his brief, relies on the Board of Tax Appeals' decision in *Grand Duchess Steaks, Inc.,* v. *Bowers,* BTA No. 36791, 2 Ohio Tax Cases, Pt. 2, paragraph 200-801, as controlling on this issue. While the question of the taxation of trading stamps has not been decided by this court (*cf. Red Head Premium Co.* v. *Schneider* [1964], 1 Ohio St. 2d 45, 203 N. E. 2d 315) and need not be decided under the facts of this case, it is nevertheless interesting to note that when the Board of Tax Appeals decided that question in the *Grand Duchess case,* it held that if a business, with each purchase of its products, gives a customer coupons which state that they may be exchanged for premiums at a specified monetary value, it incurs sales tax liability upon redemption of the coupons measured by the cash value of the redeemed merchandise. The taxpayer in the *Grand Duchess case* did not collect the sales tax upon the coupons when distributed or the merchandise at the time the coupons were redeemed. Thus, as can be seen in the opinion, the factual situation presented by the instant case is clearly distinguishable from the *Grand Duchess case.*

"Q. Let's take an example that we heard in the opening statement. Let's take a can of Jewel Floor Wax.
" * * *

"A. If a can of floor wax is sold in conjunction with a general merhandise item which has become a premium balance, then the customer is charged $1.79. That is $1.64 for the floor wax and 15 cents on the premium balance.

"Q. * * * How would that $1.79 cash collection be shown?

"A. Well, the $1.79, of course, would show up in sales and be reported as a sale in the state of Ohio.
" * * *

"Q. You testified there was a bonus credit in that $1.79 of 15 cents, I think. What would be done with that?

"A. The premium balance would be reduced by the 15 cents, and since the 15 cents is included in the $1.79, nothing further has to be done with it, full retail value of both items has been included in sales.

"Q. By 'it has been included in sales,' looking at Exhibit 2, the top of the line, sales for the period of $22,997, 309, is it your testimony that that includes not only the retail value of all the floor waxes sold, but also the 15 cents of bonus credit issued with respect to all the floor wax sold?

"A. Yes.

"Q. It is your testimony, is it, or not, that these bonus credits are used to reduce the charge made for the premium or other items of general merchandise?

"A. Yes.
" * * *

"Q. Now, suppose that my wife were called on by a Jewel Home Service route man * * * she says, 'I don't want a bonus credit. I don't want a premium. I just want floor wax.' What do you do?
" * * *

"The witness: On the grocery listing as we repeated before, there are two columns of listing. If the lady has not already taken a premium and she does not want to

accrue a credit balance to take a premium later, we sell her the floor wax out and out for $1.64, and that is the end of the transaction.

"* * *

"Q. Does your company make such sales?

"A. Yes, we do.

"Q. As a part of its regular business policy, it will make sales in that way, and does?

"A. Yes.

"* * *

"Q. Let me see if I understand you, now, Mr. Simmons. You have testified, I think, that the sales for the period appearing at the top of the schedule which is Exhibit 2 of $22,997,309 includes the value of bonus credits issued and yet the sales tax examiners are setting up bonus credits issued as a separate category and applying the tax rate again to that, is that what you are saying?

"A. Yes, that is true.

"Q. All right.

"Now, I gather that implicit in your testimony concerning Exhibit 2, specifically the amount of $572,701, which is labeled retail value of bonus credits allowed on sales of exempted items—I take it that implicit in that is an admission that with respect to sales of tax exempted food, you have not reported tax—sales tax on the bonus credits that were issued with respect to those sales?

"A. No, we have not. That is the reason they are added back in here."

It is our conclusion that appellant's customers could purchase an item with or without a bonus credit. If the item was purchased with the bonus credit, sales tax was paid on the total price, i. e., the cost of the item plus the bonus credit. Thus, in the sale of a nonexempt item with a bonus credit, at the time of the sale appellant charges and collects sales tax on the value of the item and the value of the bonus credit issued to its customer. With regard to bonus credits issued in connection with the sale of exempt merchandise, appellant has stipulated that it

has not collected the sales tax due on those bonus credits. Therefore, the $572,701 in bonus credits issued in connection with the sale of exempt items should be included in the computation of its net taxable sales. With regard to sales of nonexempt items, however, the appellant has collected sales tax on all bonus credits issued and the appellee's attempt to include those bonus credits in appellant's sales would result in a prohibited double taxation.

For the reasons stated, the decision of the Board of Tax Appeals is reversed. The cause is remanded to the board for further proceedings consistent with this opinion and for final determination of any deficiency and penalty owed by appellant.

*Decision reversed.*

O'NEILL, C. J., LEACH, HERBERT, DUNCAN and CORRIGAN, JJ., concur.

LEACH, J., of the Tenth Appellate District, sitting for MATTHIAS, J.

SCHNEIDER, J., dissenting from that part of the judgment which permits the taxpayer to flout the statute requiring it to collect the entire sales tax when the sale is consummated (not when the proceeds of the sale are received) and to keep adequate records. Concededly, the taxpayer did neither.

To this extent, the reversal is an affront to the sovereignty of the state, to the public and to every vendor who conscientiously fulfills his obligations under the tax laws.

Moreover, I am unable to discern what the executive branch may permissibly do to correct the situation short of auditing the taxpayer at more frequent intervals, which is unnecessarily expensive and inefficient.